**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DEJA WASHINGTON,
        **Plaintiff,**

   v.

FEDLOAN SERVICING
        **Defendant.**

CIVIL ACTION
NO. 19-143

**MEMORANDUM**

SCHMEHL, J.    /s/ JLS                                SEPTEMBER  8, 2021

    Plaintiff brought this action, claiming Defendant FedLoan Servicing ("FedLoan") violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681s-2(b) by reporting inaccurate and misleading information on her credit report and by failing to conduct a good faith investigation into the allegedly inaccurate reporting.[1] Presently before the Court is the motion of FedLoan for summary judgment. For the reasons that follow, the motion is granted.

**STANDARD OF REVIEW**

    A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423

---

[1] The Complaint also named Chrysler Capital Corp and TransUnion, LLC as Defendants, but the Plaintiff has reached a settlement agreement with both.

(3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248).

Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. See *Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c).

Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**FACTS**

The following facts, taken from FedLoan's Undisputed Statement of Facts (ECF 39-13), are not in dispute:

1. The Pennsylvania Higher Education Assistance Agency ("PHEAA") is a statutorily created instrumentality of the Commonwealth of Pennsylvania, with its principal place of business in Harrisburg, Pennsylvania, which conducts its federal student loan servicing activities under the business name FedLoan. 24 P.S. §§ 5101 – 5199.9. (Answer and Affirmative Defenses of Defendant FedLoan Servicing at ¶ 6.)

2. On June 21, 2007, Plaintiff signed and submitted a Federal Student Loan Master Promissory Note to receive student loans under the Federal Family Education Loan Program ("FFELP").

3. Plaintiff received FFELP student loans pursuant to the Master Promissory Note and federal student loans to finance her post-secondary education from 2007 through 2012. (Deposition of Deja Washington, November 5, 2019, at p. 12:16-20, included within "Exhibit 1" to FedLoan's Motion for Summary Judgment.)

4. On June 17, 2016, Plaintiff signed and submitted a Federal Direct Consolidation Loan Application and Promissory Note to consolidate her student loans, including the FFELP loans and federal student loans Plaintiff received to finance her education. (FedLoan's Request for Admissions to

Plaintiff at ¶ 4, and Federal Direct Consolidation Loan Application and Promissory Note attached as Exhibit D, included within "Exhibit 7" to FedLoan's Motion for Summary Judgment.)

5.  By letter dated July 30, 2016, FedLoan notified Plaintiff that the consolidation of her student loans was completed, and identified the loans that were included within her Direct Consolidation Loan. (FedLoan's response to Washington's Request for Production of Documents, pp. 319–321, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment.)

6.  Plaintiff's Direct Consolidation Loan was disbursed on July 29, 2016, and consisted of a subsidized portion with a balance of $25,882.29 and an unsubsidized portion of $31,915.65, for a total amount of $57,797.94. (FedLoan's response to Washington's Request for Production of Documents, p. 321, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment.)

7.  . Upon Plaintiff's Direct Consolidation Loan being disbursed by the Department of Education ("DOE"), FedLoan began servicing Plaintiff's Direct Consolidation Loan. (FedLoan's response to Washington's Request for Production of Documents, pp. 324-326, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment.)

8.  Plaintiff's first payment due date on her Direct Consolidation Loan was September 26, 2016. (FedLoan's response to Washington's Request for

Production of Documents, p. 260, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment.)

9.  Plaintiff did not make the required payment on her Direct Consolidation Loan by September 26, 2016. (FedLoan's response to Washington's Request for Production of Documents, pp. 333-335, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment.)

10. By letter dated October 19, 2016, FedLoan notified Plaintiff that she was delinquent on her Direct Consolidation Loan, and requested that she make payments to bring her loan current. (FedLoan's response to Washington's Request for Production of Documents, pp. 333-335, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment.)

11. Plaintiff did not make any payments on her Direct Consolidation Loan subsequent to the October 19, 2016 letter. (FedLoan's response to Washington's Request for Production of Documents, pp. 256-260, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment.)

12. By letter dated December 3, 2016, FedLoan again notified Plaintiff that she was delinquent on her Direct Consolidation Loan, and requested that she make payments to bring her loan current. (FedLoan's response to Washington's Request for Production of Documents, pp. 338-340, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment.)

13. Also, by letter dated December 3, 2016, FedLoan notified Plaintiff that her Direct Consolidation Loan would default on July 1, 2017, if no payments were made, and again urged Plaintiff to make payments to bring her

account current. (FedLoan's response to Washington's Request for Production of Documents, pp. 341-343, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment.)

14. Subsequent to Plaintiff's Direct Consolidation Loan being disbursed on July 29, 2016, Plaintiff failed to make any payments on the loan. (FedLoan's response to Washington's Request for Production of Documents, pp. 1117-1118, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment at ECF 77-2, pp. 329-330.)

15. In February 2017, due to non-payment, Plaintiff's Direct Consolidation Loan became one hundred and twenty (120) days delinquent. (FedLoan's response to Washington's Request for Production of Documents, p. 1117; FedLoan's Request for Admissions to Plaintiff at ¶ 5; Deposition of Deja Washington, November 5, 2019, at p. 15:1-10, included within "Exhibits 1, 4, and 7" to FedLoan's Motion for Summary Judgment.)

16. Beginning February 2017, FedLoan began reporting to the credit reporting agencies Plaintiff's Direct Consolidation Loan as being one hundred and twenty (120) days delinquent. (FedLoan's response to Washington's Request for Production of Documents, p. 1117, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment at ECF 77-2, p. 329.)

17. On October 3, 2017, FedLoan submitted to the DOE a request to transfer Plaintiff's Direct Consolidation Loan due to non-payment on the loan. (FedLoan's response to Washington's Request for Production of

Documents, p. 140, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment.)

18. On October 12, 2017, due to non-payment, Plaintiff's Direct Consolidation Loan charged off FedLoan's servicing system, and was transferred to the DOE. (FedLoan's response to Washington's Request for Production of Documents, p. 140 – 141 (Activity Detail Screen); p. 1117 (FedLoan's Credit Reporting of Deja Washington), included within "Exhibit 4" to FedLoan's Motion for Summary Judgment at ECF 77-2, p. 329.)

19. For each month from February 2017 through September 2017, payments on Plaintiff's Direct Consolidation Loan were at least 120 days delinquent. (Plaintiff's response to FedLoan's Requests for Admission at ¶ 6, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

20. At the time Plaintiff's Direct Consolidation Loan transferred from FedLoan's servicing system to the DOE on October 12, 2017, payments on the loan were at least 120 days delinquent. (FedLoan's response to Washington's Request for Production of Documents, p. 1117, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment at ECF 77-2, p. 330.)

21. Beginning in October 2017, due to Plaintiff's Direct Consolidation Loan charging off of FedLoan's servicing system due to non-payment, FedLoan began reporting the status of Plaintiff's loan as "E – Zero balance and current account," with a status of "05–Account transferred," a special comment of "AT-account closed due to transfer," and a payment rating of "6-180 or more days past the due date." (FedLoan's response to

Washington's Request for Production of Documents, pp. 1117-1118, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment at ECF 77-2, pp. 329-330.)

22. Beginning in October 2017, Plaintiff's credit report reflected her Direct Consolidation Loan as having a zero ($0.00) current balance, and a zero ($0.00) past due balance to all three credit reporting agencies. (Plaintiff's response to FedLoan's Requests for Admission at ¶¶ 1 and 2, and Credit Reports of Deja Washington, included within "Exhibit 9" to FedLoan's Motion for Summary Judgment.)

23. By letter dated April 26, 2018, Plaintiff submitted a dispute regarding the credit reporting of her Direct Consolidation Loan to TransUnion. (FedLoan's response to Washington's Request for Production of Documents, p. 1177, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment at ECF 77-2, p. 389.) The letter stated, "[t]hese accounts are showing the wrong status. It states that the account is currently past due but it cannot be currently late. The balance clearly shows $0. Further, I think the accounts were transferred which also means its impossible for it to be currently late with this creditor. This is hurting my credit." *Id.*

24. FedLoan received notice of Plaintiff's credit dispute from TransUnion on May 12, 2018 via an Automated Credit Dispute Verification ("ACDV"). (FedLoan's response to Washington's Request for Production of Documents, p. 1174, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment at ECF 77-2 p.386). The ACDV contained two dispute

codes: "106-Disputes present/previous Account Status/Payment Rating/Account History. Verify Account Status, Payment Rating and Account History" and "118-Disputes Current Balance and/or Amount Past Due. Verify Current Balance or Amount Past Due." Finally, the ACDV requested that transfer of the account should be verified. *Id*.

25. FedLoan responded to the ACDV from TransUnion resulting from Plaintiff's indirect dispute on June 4, 2018. (FedLoan's response to Washington's Request for Production of Documents, pp. 1174-1176, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment at ECF 77-2, pp. 386-388.)

26. By letter dated May 7, 2018, Plaintiff submitted a dispute regarding the credit reporting of her Direct Consolidation Loan to Equifax. (FedLoan's response to Washington's Request for Production of Documents, p. 1192, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment at ECF 77-2, p. 404.)

27. FedLoan received notice of Plaintiff's credit dispute from Equifax on May 16, 2018 via an ACDV. (FedLoan's response to Washington's Request for Production of Documents, pp. 1189-1191, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment at ECF 77-2, pp. 401-403.)

28. Within Plaintiff's May 7, 2018 dispute, she indicated FedLoan's reporting included inaccurate information and requested that her ID be confirmed and all Account Information be verified. (FedLoan's response to Washington's

Request for Production of Documents, p. 1189, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment at ECF 77-2, p. 401.)

29. FedLoan responded to the ACDV from Equifax resulting from Plaintiff's indirect dispute on June 4, 2018. (FedLoan's response to Washington's Request for Production of Documents, p. 1189, included within "Exhibit 4" to FedLoan's Motion for Summary Judgment at ECF 77-2, p. 401.)

30. By April 28, 2018, Plaintiff's credit history included at least 3 accounts with lenders in her credit history in delinquent status, at least 5 accounts with lenders in a derogatory status, and at least one account with a lender in collection status. (Plaintiff's response to FedLoan's Requests for Admission at ¶¶ 8-10, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

31. In September 2016, Plaintiff took out a loan or lease for an automobile with a lender identified as "NISSN INF LT," account number 2500771****. (Plaintiff's response to FedLoan's Requests for Admission at ¶ 11, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

32. In January 2017, Plaintiff became delinquent on her loan with "NISSN INF LT," account number 2500771****. (Plaintiff's response to FedLoan's Requests for Admission at ¶ 12, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

33. By April 2018, Plaintiff's loan with "NISSN INF LT" was reported by Transunion with a payment status of "Collection/Chargeoff," by Experian with a payment status of "Repossession," and by Equifax with a payment

status of "Collection/Chargeoff." (Plaintiff's response to FedLoan's Requests for Admission at ¶ 13, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

34. Plaintiff's vehicle financed with a loan or lease from "NISSN INF LT," account number 2500771****, was repossessed as a result of her delinquent payments. (Plaintiff's response to FedLoan's Requests for Admission at ¶ 14; Deposition of Deja Washington, November 5, 2019, p. 56:11-18, included within "Exhibits 1 and 8" to FedLoan's Motion for Summary Judgment.)

35. In May 2016, Plaintiff took out a loan or lease for an automobile with a lender identified as "NISSN INF LT," account number 2500762****. (Plaintiff's response to FedLoan's Requests for Admission at ¶ 15, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

36. In December 2016, Plaintiff became delinquent on her loan or lease with "NISSN INF LT," account number 2500762****. (Plaintiff's response to FedLoan's Requests for Admission at ¶ 16, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

37. By August 2019, Plaintiff's loan with "NISSN INF LT," account number 2500762****, was reported by TransUnion with a payment status of "Involuntary repossession," by Experian with a payment status of "Involuntary repossession. Merchandise was taken back by credit grantor/there may be a balance due," and by Equifax with a payment status of "Involuntary Repossession Auto." (Plaintiff's response to FedLoan's

Requests for Admission at ¶ 17, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

38. Plaintiff's vehicle financed with a loan or lease from "NISSN INF LT," account number 2500762****, was repossessed due to her delinquent payments. (Plaintiff's response to FedLoan's Requests for Admission at ¶ 18, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

39. In December 2012, Plaintiff received credit for a credit card with "CAPITALONE," account number 51780578****. (Plaintiff's response to FedLoan's Requests for Admission at ¶ 19, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

40. In February 2017, Plaintiff became delinquent on her payments for her credit card with "CAPITALONE," account number 51780578****. (Plaintiff's response to FedLoan's Requests for Admission at ¶ 20, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

41. By April 2018, Plaintiff's credit card with "CAPITALONE," account number 51780578****, was reported by TransUnion with a payment status of "Collection/Chargeoff," by Experian with a payment status of "Collection Chargeoff," and by Equifax with a payment status of "Collection Chargeoff." (Plaintiff's response to FedLoan's Requests for Admission at ¶ 21, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

42. In relation to Plaintiff's credit card with "CAPITALONE," account number 51780578****, Plaintiff's Three Bureau Credit Report dated April 28, 2018, lists comments from TransUnion of "Charged off as bad debt Canceled by

credit grantor," Experian of "Account has been closed due to inactivity. Unpaid balance reported as a loss by the credit grantor," and Equifax as "Charged off account Accounts closed by credit grantor." (Plaintiff's response to FedLoan's Requests for Admission at ¶ 22, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

43. In September 2016, Plaintiff was approved for a credit card with "DISCOVERBANK," account number 60110003****. (Plaintiff's response to FedLoan's Requests for Admission at ¶ 23, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

44. In September 2018, Plaintiff became delinquent on her payments for her credit card with "DISCOVERBANK," account number 6011003****. (Plaintiff's response to FedLoan's Requests for Admission at ¶ 24, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

45. Plaintiff's credit card with "DISCOVERBANK," account number 6011003****, was reported by TransUnion as delinquent for the months of September 2018 through December 2018, by Experian for the months of September 2018 through December 2018, and by Equifax for the months of September 2018 to November 2018. (Plaintiff's response to FedLoan's Requests for Admission at¶ 25, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

46. In August 2018, Plaintiff was approved for a credit card with "CREDITONEBNK," account number 444796240593****. (Plaintiff's

response to FedLoan's Requests for Admission at ¶ 26, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

47. In November 2018, Plaintiff became delinquent on her payments for her credit card with "CREDITONEBNK," account number 444796240593****. (Plaintiff's response to FedLoan's Requests for Admission at ¶ 27; Deposition of Deja Washington, November 5, 2019, p. 19:3-11, included within "Exhibits 1 and 8" to FedLoan's Motion for Summary Judgment.)

48. Plaintiff's credit card with "CREDITONEBNK," account number 444796240593****, was reported by TransUnion as delinquent for the months of November 2018 and December 2018, was reported by Experian as delinquent for the months of November 2018 and December 2018, and was reported as delinquent by Equifax for the month of November 2018. (Plaintiff's response to FedLoan's Requests for Admission at ¶ 28, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

49. In March 2018, Plaintiff received an installment loan with "LEAD BANK," account number 1166****. (Plaintiff's response to FedLoan's Requests for Admission at ¶ 29, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

50. In August 2018, Plaintiff became delinquent on her payments for her installment loan with "LEAD BANK," account number 1166****. (Plaintiff's response to FedLoan's Requests for Admission at ¶ 30, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

51. Plaintiff's installment loan with "LEAD BANK," account number 1166****, was reported by TransUnion as delinquent for the months of August 2018 and September 2018, was reported by Experian as delinquent for the months of August 2018 and September 2018, and was reported by Equifax as delinquent for the months of August 2018 and September 2018. (Plaintiff's response to FedLoan's Requests for Admission at ¶ 31, included within "Exhibit 8" to FedLoan's Motion for Summary Judgment.)

52. As of April 28, 2018, Plaintiff's credit score was reported as 523 by TransUnion, 506 by Experian, and 521 by Equifax. (Plaintiff's response to FedLoan's Requests for Admission at ¶ 1, and April 28, 2018 Credit Report of Deja Washington, included within "Exhibits 7 and 8" to FedLoan's Motion for Summary Judgment.)

53. As of August 9, 2019, Plaintiff's credit score was reported as 585 by TransUnion, 572 by Experian, and 580 by Equifax. (Plaintiff's response to FedLoan's Requests for Admission at ¶ 1, and August 9, 2019 Credit Report of Deja Washington, included within "Exhibits 7 and 8" to FedLoan's Motion for Summary Judgment.)

54. On February 28, 2019, Plaintiff requested a loan in an amount of $2,000.00 from Citadel Federal Credit Union. (Plaintiff's response to FedLoan's Request for Production of Documents (Citadel Federal Credit Union Adverse Action Notice), included within "Exhibit 6" to FedLoan's Motion for Summary Judgment.)

55. Plaintiff received an Adverse Action Notice from Citadel Federal Credit Union advising her that Citadel Bank was unable to extend credit to her at this time. (Plaintiff's response to FedLoan's Request for Production of Documents (Citadel Federal Credit Union Adverse Action Notice), included within "Exhibit 6" to FedLoan's Motion for Summary Judgment.)

56. Citadel Federal Credit Union's Adverse Action Notice indicated its decision was based in whole or in part on information obtained in a report received from TransUnion. (Plaintiff's response to FedLoan's Request for Production of Documents (Citadel Federal Credit Union Adverse Action Notice), included within "Exhibit 6" to FedLoan's Motion for Summary Judgment.)

57. Citadel Bank's Adverse Action Notice indicated that Plaintiff's credit score as of February 28, 2019 was 489. Citadel Bank's Adverse Action Notice indicated several key factors that affected Plaintiff's credit score, including: a. Serious delinquency, and public record or collection filed; b. Time since delinquency is too recent or unknown; c. Number of accounts with delinquency; d. Too many accounts with balances; and e. Number of inquiries adversely affected the credit score. (Plaintiff's response to FedLoan's Request for Production of Documents (Citadel Federal Credit Union Adverse Action Notice), included within "Exhibit 6" to FedLoan's Motion for Summary Judgment.)

58. Plaintiff testified at her deposition that on November 5, 2017, she was denied a credit card from SynchBToys R Us DC. (Deposition of Deja Washington, November 5, 2019, p. 59:12-24.)

59. Plaintiff testified that in March of 2018, she was denied by multiple financial institutions for a car loan. (Deposition of Deja Washington, November 5, 2019, p. 29:14-30:10.)

**PLAINTIFF'S CLAIMS**

To put Plaintiff's credit history in proper context, FedLoan's expert, John Ulzheimer, noted that the "Plaintiff's credit reports contain a record of over 100 late payments, three collections, two charged off accounts and two automobile repossessions." ECF 28-10 at p. 16. Indeed, Ulzheimer opined that "[i]n my 28+ years in the credit industry, the Plaintiff's credit reports are among the worst I've ever seen." *Id*.

Yet, Plaintiff argues that her credit report from FedLoan is incorrect and misleading because it reports Plaintiff's *historical* late payment information with a *current* delinquency code in the "Pay Status" field ("Account 120 Days Past Due Date") making it appear that Plaintiff is currently late and still has a balance on her student loan. As a result, Plaintiff believes that prospective lenders believe that she is currently late which negatively reflects on her creditworthiness. Noticeably, Plaintiff does not contend that her federal student loan was at least 120 days past due at the time the loan was transferred back to the DOE and that she has never made even a single payment on that loan.

Plaintiff contends that after receiving notice of Plaintiff's dispute from TransUnion and Experian, FedLoan willfully and negligently failed to conduct a reasonable investigation of the inaccurate information that Plaintiff disputed, and

continued reporting the inaccurate information to the credit bureaus. Compl. at ¶ 32. Plaintiff claims that as a result of FedLoan's actions, she has suffered, *inter alia,* "loss of creditworthiness" and a "loss of credit opportunity" *Id.* at 35.

In its motion for summary judgment, FedLoan argues that it conducted a good faith and reasonable investigation into the complaints Plaintiff raised with TransUnion and Experian. FedLoan argues that the results of its investigation revealed that the reported "Pay Status" as "Account 120 Days Past Due Date" is simply not inaccurate and could not reasonably mislead creditors into believing that the student loan is currently past due when considered in the context of the other information given about the account – that it was closed as of October 3, 2017 and has a zero-dollar balance. FedLoan argues that the "Pay Status" field accurately reflects that Plaintiff was more than 120 days behind in her obligations on this federal school loan at the time the loan was closed as of October 3, 2017 and that prospective lenders need to be aware of this delinquency.

**DISCUSSION**

Congress enacted the FCRA "to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Cortez v. Trans Union*, 617 F. 3d 688, 707 (3d Cir. 2010). To support these goals, Congress included "provisions intended 'to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information.'" *Id*. [citations omitted.] In *Cortez,* our Court Appeals instructs,

"'[t]hese consumer oriented objectives support a liberal construction of the [FCRA],' and any interpretation of this remedial statute must reflect those objectives." *Id.* [citations omitted.]

As a federal student loan servicer, FedLoan is required to report the history of all borrower accounts to the national credit reporting agencies. 34 C.F.R. § 685.211. In this regard, FedLoan acts as a "data furnisher." A data furnisher is an entity that furnishes information regarding a consumer to the credit reporting agencies ("CRA") for inclusion on a consumer's credit report. *Harris v. Pennsylvania Higher Education Assistance Agency*, 696 Fed. App'x. 87, 90 (3d Cir. June 22, 2017) (citing 16 C.F.R. § 660.2(c)). 15 U.S.C. § 1681s-2(b) imposes certain duties on a data furnisher who has been notified by a consumer credit reporting agency that a consumer has disputed information furnished by that data furnisher. *See Seamans v. Temple University*, 744 F.3d 853, 864-65 (3d Cir. 2014). Once the data furnisher receives such notice, the data furnisher must

> (A) conduct an investigation with respect to the disputed information; (B) review all relevant information provided by the [CRA] ...; (C) report the results of the investigation to the [CRA]; (D) if the investigation finds that the information is incomplete or inaccurate, report [the results of the investigation] to all other [CRAs] to which the [furnisher] furnished the [disputed] information ...; and (E) [modify, delete, or permanently block the reporting of disputed information that the furnisher finds inaccurate, incomplete, or unverifiable after reinvestigation.]

15 U.S.C. § 1681s–2(b)(1).

Section 1681s-2(b) of FCRA allows a consumer to sue a data furnisher if the furnisher provides "incomplete or inaccurate" information to a CRA and then refuses to "delete" or "modify" that information in response to a consumer complaint. 15 U.S.C. § 1681s-2(b)(1). Our Court of Appeals has explained that "[a] report is inaccurate when it is 'patently incorrect' or when it is 'misleading in such a way and to such an extent that it can be expected to [have an] adverse[ ]' effect." *Schweitzer v. Equifax Info. Solutions LLC*, 441 Fed. Appx. 896, 902 (3d Cir.2011) (quoting *Dalton v. Capital Assoc. Indus. Inc.*, 257 F.3d 409, 415 (4th Cir.2001)). In determining whether reported information is misleading, the Court must view the information in a credit report from the perspective of a reasonable creditor. *Horsch v. Wells Fargo Home Mortg.*, 94 F. Supp. 3d 665, 681 (E.D. Pa. 2015).

According to the affidavit of the Risk, Policy and Compliance Coordinator for the Credit Bureau Reporting Department at PHEAA, Leslie Harris ("Harris"), the ACDV FedLoan received from TransUnion on May 12, 2018, contained "dispute codes 106 and 118, as well as a separate instruction requesting FedLoan verify [Plaintiff's] federal student loan was indeed transferred." ECF 39-3 at ¶19. According to Harris, "[d]ispute Code 106 includes instruction that the data furnisher needs to verify the Account Status, Payment Rating, and Account History." *Id*. at ¶ 20. "Dispute Code 118 includes instruction that the data furnisher needs to verify Current Balance and the Amount Past Due." *Id.* at ¶ 21.

Harris avers that "[w]hen responding to credit disputes, FedLoan processors follow the procedures in FedLoan's 'Credit Dispute Resolution

Procedure' [CDRP] document." *Id.* at ¶ 22. Harris avers that the FedLoan CDRP instructs that for federal student loans, "Account Status '05' should be used for all federal student loans which are transferred or deconverted due to delinquency." *Id.* at ¶ 23. Under the CDRP, if the Account Status of 05 is used, "'the Payment Rating must be populated based on the status of the loan immediately prior to the condition that resulted in such status.'" *Id.* at ¶ 24. According to Harris, "[t]he CDRP instructs that the payment Rating of '6' must be used for transferred federal loans which are at least 180 days past due." *Id.* at ¶ 25. Harris further avers that with regard to the Current Balance, the CDRP instructs, "'The current balance must be zero when the Account Status is 05. . . .'" *Id.* at ¶ 26. With regard to the Amount Past Due, "CDRP instructs, 'The Amount Past Due is zero when the Account Status is 05. . . ." *Id.* at ¶ 27.

FedLoan responded to the TransUnion ACDV on June 4, 2018. *Id.* at ¶ 28. In its response, FedLoan verified the Account States as "05" – meaning "account transferred". FedLoan also updated the Payment Rating from "4" (120-149 days past due) to "6" (180 or more days past due) *Id.* at ¶¶29-30. FedLoan further verified the current balance was $0.00, and updated the past balance, actual payment and scheduled monthly payment to all reflect $0.00 *Id.* at ¶ 29. As such, Harris characterizes that Fedloan's investigation of the TransUnion ACDV as "reasonable." *Id.* at ¶ 30.

FedLoan also received an ACDV from Equifax on May 16, 2018. *Id.* at ¶ 31. The Equifax ACDV contained only one dispute code 112, "which generally requests the data furnisher to confirm a complete ID and verify all Account

Information." *Id*. at ¶ 32. FedLoan responded to the Equifax ACDV on June 4, 2018. *Id*. at ¶ 34. Harris avers that the "only notable distinction between the TransUnion ACDV and the Equifax ACDV is that the Equifax ACDV references an Account Status of 82, and no Payment Rating was provided by Equifax in the 'Request Data' filed." *Id*. at ¶ 34. According to Harris, the CDRP explains that Account Status 82 "is only appropriate for student loans still being serviced by FedLoan, which are past due between 120 and 149 days." *Id*. at ¶ 35. In addition, Harris avers that since Plaintiff's loan had been transferred, FedLoan in its response updated the Account Status filed to "05." *Id*. at ¶ 36. Since the Account Status was 05, FedLoan also added in its response that the "Payment Rating" was "6." *Id*. at ¶ 37. Finally, "FedLoan also verified all balances, payments and past due amounts were $0.00." *Id*. at ¶ 38.

Finally, Harris averred that FedLoan verified or modified all of Plaintiff's demographic information consistent with the CDRP. *Id.* at ¶ 40. Harris concluded by averring that FedLoan's response to the Equifax dispute "is consistent with its internal records verifying that [Plaintiff's] federal student loan transferred to the DOE when it was more than 180 days past due, and all balances and past due amounts were $0.00. FedLoan's investigation of the Equifax ACDV was reasonable." *Id*. at ¶ 41.

The Court finds that FedLoan complied with its obligations under 15 U.S.C. § 1681s–2(b)(1). FedLoan investigated and reviewed the disputed information supplied in the TransUnion and Equifax ACDVs after which it either verified or modified the disputed information pursuant to its Credit

Dispute Resolution Procedure. Unfortunately for Plaintiff one of the modifications it made accurately reflected that Plaintiff had actually been 180 days or more delinquent (instead of 120 days or more past due) at the time her loan was transferred.

Further, the Court finds, as a matter of law, that there is nothing in Plaintiff's credit report that it is "patently incorrect" or "misleading in such a way and to such an extent that it can be expected to have an "adverse effect" on Plaintiff's creditworthiness. *Schweitzer* 441 Fed. App'x. at 902.

In *Schweitzer*, our Court of Appeals held a CRA accurately represented information in its reports when a mortgage account read "Over 120 Days Past Due," but the "ADDITIONAL INFORMATION" field in the same report showed "Account Paid/Zero Balance." *Schweitzer*, 441 F. App'x at 902. The consumer argued the reporting agency violated the FCRA by stating his mortgage account "had been 'Over 120 Days Past Due'" in two different credit reports. *Id*. Our Court of Appeals affirmed summary judgment on this entry because the reporting agency "properly reflected" the consumer had paid off the balance of his account. *Id*. at 902. As a result, the Court determined the report did not include inaccurate information. *Id*.

Indeed, district courts both in this Circuit and throughout the country have routinely granted defendants' dispositive motions on  plaintiffs' § 1681s-2(b) claims that the reporting of terms of a closed account with zero balance, yet with the pay status listed as past due is not "patently incorrect" or "misleading." *See, e.g., Samoura v. Trans Union LLC*, 2021 WL 915723 (E.D. Pa. March 10,

2021)(Kearney, J.); *Parke* v. *Trans Union, LLC*, No. 20-4487, ECF Doc. No. 32 (Order) (E.D. Pa. March 5, 2021)(Robreno, J.); *Bibbs v. Trans Union LLC*, 2021 WL 695112 (E.D. Pa. February 23, 2021)(Kearney, J.); *See also, e.g., Gross v. Private National Mortgage Acceptance Co.*, LLC, 2021 WL 81465 (E.D.N.Y. Jan. 9, 2021) [2]; *Hernandez v TransUnion, LLC*, No. 19-cv-1987, Dkt. No. 82, (N.D. Fla. Dec. 10, 2020) (concluding that reporting a "pay status" as "120 days past due" for a closed account with a $0 balance "would not reasonably mislead a creditor to believe [the plaintiff] is currently past due on this loan"); *Settles v. Trans Union, LLC*, 2020 WL 6900302 (M.D. Tenn. Nov 24, 2020) (same); *Euring v. Equifax Information Servs.*, LLC, No. 19- cv-11675, 2020 WL 1508344 (E.D. Mich. Mar. 30, 2020) (finding nothing false or materially misleading about the "monthly payment" information on plaintiff's credit reports in light of the other information that appears on those reports); *Parker v. 1st Franklin Financial Corp., et. al*, No. 1:19-cv-1897-TCB-JKL (Document 42)(January 10, 2020) (adopted January 15, 2020); *Magee v. Ford Motor Credit Company, LLC*, No. 2:18-cv-148-KS-MTP, 2019 WL 7593371 (S.D.Miss. November 15, 2019); *Burrow v. Equifax Info. Sys.*, LLC, Case Action File No. 1:18-cv-05134-JPB-LTW, 2019 WL 54417147, at *8-*9, (N.D.Ga., August 5, 2019) adopted report and recommendation 2019 WL 5410067 (N.D.Ga. August 26, 2019); *Jones v. Equifax Info. Servs.,* LLC, No. 2:18-cv-2814, 2019 WL 5872516 (M.D. Tenn. Aug. 8,

---

[2] The Court is aware that Judge Cogan subsequently allowed the Plaintiff to amend the Complaint against the furnisher defendant to include the allegation that "credit scoring algorithms look to the pay status field as a field that instructs whether the account should be considered as an actively derogatory." Plaintiff has made no such allegation in this case and his expert, Evan Hendricks, also make no reference to "credit scoring algorithms."

2019) (finding that a credit report showing a monthly payment obligation when the account was closed and had a zero-dollar balance was not materially misleading because "a reasonable prospective lender would understand [that] the report showed a past obligation only"); *Meeks v. Equifax Information Services, LLC*, Civil Action File No. 1:18-cv-03666-TWTWEJ, 2019 WL 1856411, at *5 (N.D. Ga. March 4, 2019), report and recommendation adopted 2019 WL 1856412 (N.D. Ga. April 23, 2019); *Hunt v. J.P. Morgan Chase Bank, N.A.*, Case No. 17-cv-62094-BB, 2018 WL 1183357 (S.D. Fl. February 23, 2018); *Alston v. Equifax Information Services, LLC*, Civil Action No. TDC-13-1230, 2014 WL 6388169 (D.Md., November 13, 2014).

Pursuant to the Credit Reporting Resource Guide ("CRRG"), a data furnisher such as FedLoan that is servicing a transferred account is required to report the "Pay Status" at the time the account is transferred and not on the date of access. Harris Affidavit, ECF 39-3, Ex. A at p. 22, FAQ No. 46; Ulzheimer Report, ECF 39-10 at p. 14. As one district court has explained, "[t]he payment rating code, then, is indicative of the status of the paid or closed account *while the account was still active*, not at the time the consumer's credit report is accessed." *Moulton v. Americredit Financial Services, Inc.*, No. C. 04-02485 JW, 2006 WL 8459731, at *3 (N.D.Ca. December 29, 2006) (emphasis in original). In addition, all of the above cases have found that the tradeline must be viewed in its entirety, rather than simply focusing on a single field such as "Pay Status."

On October 3, 2017, the date FedLoan requested that Plaintiff's student loan be transferred to the DOE for non-payment, Plaintiff's tradeline appeared as follows:



ECF 43-1, Ex. A.

By examining Plaintiff's credit report as it appeared on October 3, 2017, a reasonable creditor would note that in addition to the "Pay Status" field being marked on the tradeline as "Account 120 Days Past Due Date," the remainder of the tradeline reveals that "Date Closed" was "10/3/2017" and directly across the "Balance" field reads "$0." In addition, the remarks section contains, *inter alia*, the notation "ACCT CLOSED DUE TO TRANSFER; TRANSFERRED TO ANOTHER OFFICE." The Court finds that any reasonable creditor construing the tradeline in its entirety, as mandated by the prior referenced cases, would clearly realize that Plaintiff's loan with FedLoan was closed due to transfer and had a remaining balance of $0.The tradeline also provides payment history that clearly

shows that Plaintiff became 120 days delinquent on her student loan in February, 2017 and that she remained at least 120 days delinquent through the date her account was transferred.

Further, on October 12, 2017, the date Plaintiff's loan was transferred to the DOE, Plaintiff tradeline noted a payment rating of 6-180 days or more past the due date, but also that the current balance on her loan was $0.00, the scheduled monthly payment was $0.00, the actual payment amount was $0.00, **the amount past due** was $0.00, and that the status of the account was 05-closed due to transfer. ECF 77-2, p. 330. There is simply nothing in Plaintiff's credit report that a reasonable jury could find misleading.

Under these circumstances, reporting a Pay Status of "current" or "paid as agreed" as advocated by Plaintiff could imply that Plaintiff satisfied her loan obligations when it is clear that she never made a payment on her student loan and actually defaulted. Indeed, Plaintiff is fortunate that the "Balance" field reads "$0.00" and that the tradeline lists her account as closed given the undisputed fact that Plaintiff never made a single payment on her loan and, as a result, the loan needed to be transferred back to the DOE.

To add further clarity to the matter, FedLoan's expert opined:

> FedLoan credit reported the Plaintiff's defaulted student loan in compliance with industry standards as per CRRG guidance regarding how to report accounts that were transferred while delinquent. The Plaintiff's loan was, in fact, at least 120 days past due/late when FedLoan transferred the loan back to the United States Department of Education.

> Per CRRG guidance going back to at least 2009, an account that has been transferred internally or to a

servicer is to be reported with a zero balance and with an Account Status Code that specifies the status of the account AT THE TIME OF TRANSFER (emphasis in original).

When the subject FedLoan account was transferred it was, in fact, 120 days past due. Simply put and pursuant to long standing industry guidelines FedLoan properly reported the Account Status as being 120 days past due as of September 2017.

The status of an account or, formally, the Account Status is a Metro-2 field representing the condition of an account as of the Date of Account Information. It does not and is not intended to represent the condition of an account as of the current date. In fact, FedLoan had not reported the Plaintiff as being currently delinquent on her loan since September of 2017, when she was at least 120 days delinquent. Since September 2017 FedLoan reported "no data" as a current status.

ECF 39-19 at pp. 14-15. As to Plaintiff's claim that she suffered "loss of creditworthiness" or "loss of credit opportunity," FedLoan's expert stated:

…there is simply no evidence in the record of this lawsuit that any of this actually occurred. And, if it did occur there is no evidence the Plaintiff was denied credit or experienced adverse creditor actions as a result of FedLoan's credit reporting. However, given the prevalence of unrelated derogatory information polluting the Plaintiff's credit reports, it would not surprise me if creditors avoided doing business with the Plaintiff as she has a long record of irresponsible credit management including defaults, collections and automobile repossessions.

*Id*. at p. 16.

In his expert report, Plaintiff's expert, Evan Hendricks, opined that:

- A well-known and long-standing cause of credit report inaccuracy and/or incompleteness is the furnishing of inaccurate and/or incomplete data by furnishers such as Defendant PHEAA.

- Knowledge of and consensus about this problem was so widespread that in 1996, Congress amended the FCRA to place a duty on 'furnishers' of credit report information, such as PHEAA, to report accurate information to consumer reporting agencies, and to investigate consumers' disputes of inaccurate and/or incomplete data that were forwarded to furnishers by CRAs.

- PHEAA failed both of its accuracy-related responsibilities. First, it furnished information to CRAs portraying Plaintiff with the **current** 'Pay Status' of 'Account 120 Days Past Due Date,' when in fact as of January 2018 Plaintiff was not past due on any obligation to PHEAA because she did not have any obligation for any debts to PHEAA. (emphasis in original.)

- Second, when Plaintiff disputed the inaccurate PHEAA tradeline, PHEAA, rather than conducting an adequate investigation which was reasonably calculated to determine the accuracy or completeness of the disputed data, merely confirmed that the inaccurate, **current** 'Pay Status' of 'Account 120 Days Past Due Date,' should remain in Plaintiff's Trans Union credit file.

- Plaintiff's ACDV dispute informed PHEAA that she was wrongly being portrayed as currently past due even though the '. . . balance clearly show(ed) $0. Further, I think the accounts were transferred which also means its (sic) impossible for it to be currently late with this creditor.'

- PHEAA's responses to her ACDV dispute were inadequate because it did not investigate sufficiently to discover that PHEAA's placement of a 'Payment Rating' of '4' was causing Plaintiff's PHEAA tradeline to be portrayed with a **current** 'Pay Status' of 'Account 120 Days Past Due Date.' So rather than discovering it was causing this inaccuracy, PHEAA worsened it by instructing TransUnion and Equifax to change the 'Payment Rating' to '6,' which then caused Plaintiff's PHEAA tradeline to be portrayed with a **current** 'Pay Status' of 'Account 180 Days Past Due Date.' (emphasis in original.)

- PHEAA's inadequate response reflected its disregard of the essence of Plaintiff's ACDV dispute—namely, that as of 2018, PHEAA's portrayal of a **current** 'Pay Status' of 'Account 120 Days Past Due Date,' was inaccurate because Plaintiff was neither past

due on any obligation to PHEAA nor even had any obligation for any debts to PHEAA. (emphasis in original.)

- PHEAA's inadequate response also reflected its disregard of the both the general notice from the FCA's enforcement authorities to furnishers as to what amounted  to an unacceptable, superficial investigation, as well as specific notice as to how the 'Payment Rating' could cause a tradeline's current status to be portrayed inaccurately.

ECF 39-11. pp. 3-4.

In a follow-up affidavit to Ulzheimer's expert report[3], Hendricks averred, in pertinent part, as follows:

> 7. PHEAA render's Plaintiffs' Equifax and Trans Union credit reports inaccurate when it furnishes a derogatory payment rating because, for Equifax and Trans Union, the payment rating supercedes [sic] the status code and thereby becomes the 'status.' This made Plaintiff wrongly appear to currently have a 'past due status' on a PHEAA account that in fact had been transferred. This derogatory status was both inaccurate and unfairly harmful to Plaintiffs' creditworthiness.

> 8. It is inconsistent with the industry standard to interpret the CRRG to allow the reporting of a current late status on an account that is transferred. On its first page, the CRRG emphasizes that in credit reporting, the goal and the most important standard is accuracy. It is patently inaccurate to furnish a payment rating that supersedes the status code. In fact, Experian, one of the "Big Three" credit reporting agencies, completely precludes this type of reporting altogether.

> 9. Interpreting the CRRG to allow the current status of a transferred account is incorrect because it results in inaccurate credit reporting which is

---

[3] In order to permit the filing of Hendrick's affidavit, the Court permitted FedLoan to depose Hendricks [ECF 50] and permitted both parties to file supplemental memoranda [ECF 53].

> misinterpreted by lenders' loan underwriting programs
> to reflect that a given account is currently late—
> harming creditworthiness

ECF 43-1 at pp 8-9.

As pointed out by FedLoan's expert, the problem is Plaintiff's expert equates the field "Pay Status" or "Account Status" of "Account 120 Days Past Due Date" with "*Current* Pay Status" of "Account 120 Days Past Due Date" in an effort to show that FedLoan's credit report was inaccurate or misleading. In his expert report, Hendricks has subjectively added and highlighted the term "current" to a field that simply states "Pay Status." According to Hendricks, since FedLoan's credit report indicated that Plaintiff's *current* status was 120 days delinquent, FedLoan's credit report was inaccurate and misleading. ECF 39-11(emphasis in original).

FedLoan's expert, however, clarifies this in his Rebuttal Report by pointing out that in the Metro 2 credit reporting language[4], "there is no such thing as a 'Current Status' or a 'Current Pay Status.'" ECF 39-10, p. 27. Instead, FedLoan's expert opined that the purpose of the "'Pay Status" field is to "**specify the status of the account at the time of the transfer** (emphasis in original). There is no guidance for transferred accounts that indicates the Account Status is supposed to represent any date after the date of transfer, up to and including the present date." *Id.*  FedLoan's expert goes on to state that "[t]he definition of 'Account

---

[4]  The Metro 2 is the standard electronic data reporting format adopted by the Consumer Data Industry Association ("CDIA"). This is the format that permits data furnishers to transmit data directly to the credit reporting agencies. The Credit Reporting Resource Guide is a document published by the CDIA, which includes the entire Metro 2 format.

Status' in the Metro 2 credit reporting language is, 'the status code that properly identifies the current condition of the account **as of the Date of Account Information**.' (emphasis in original). The Date of Account Information, as reported by [FedLoan] was October 3, 2017. The Plaintiff's account was, in fact, at least 120 days past due at that time thus FedLoan's reporting is accurate."[5] *Id*.

Plaintiff relies on a number of cases that are distinguishable from this case and the other cases cited above. In *Mund v. Transunion*, No. 18-6761, 2019 WL 955033, at * 1 (E.D.N.Y. Jan. 9, 2021), the credit report indicated that the plaintiff still had a monthly payment of $4,123 on the account, and in *Friedman v. CitiMortgage, Inc.,* No. 18-11173, 2019 WL 4194350, at * 1 (S.D.N.Y. Sept. 3, 2019), the credit report stated that the plaintiff had a monthly payment of $360. These entries "ma[de] [the plaintiffs'] monthly obligations look greater than they are," raising the plausible inference that a creditor could read the "Pay Status" as a current one. *Friedman*, 2019 WL 4194350, at *3. By contrast, in the case *sub judice*, Plaintiff defaulted on her student loan and the information provided regarding her account states that her account is closed and does not indicate any monthly payment amount.

In *Macik v. JPMorgan Chase Bank, N.A.*, No. G-14-44, 2015 WL 12999728, at * 1 (S.D. Tex. May 28, 2015), report and recommendation adopted by *Macik v. Trans Union LLC*, No. 14-44, 2015 WL 12999727 (S.D. Tex. July 31,

---

[5] The Court also notes that Hendrick's averment that "[i]nterpreting the CRRG to allow the current status of a transferred account is incorrect because it results in inaccurate credit reporting which is misinterpreted by lenders' loan underwriting programs to reflect that a given account is currently late—harming creditworthiness" appears to be a conclusory statement not supported anywhere in Hendrick's expert report or deposition.

2015), a case relied on heavily by Plaintiff's expert, the report listed a mortgage account as "90 days past due" even though the consumer had fully paid off her mortgage, including three past due payments. Here, by contrast, the Plaintiff does not dispute that she never made a single payment  and that she defaulted on her obligations to FedLoan before the account was transferred to the DOE.

*Daugherty v. Ocwen Loan Servicing*, LLC, 701 Fed.App'x. 246 (4th Cir. 2017), is also clearly distinguishable. In *Daugherty*, as in *Macik,* a mortgagee fell delinquent on his home loan but brought his account current **before** the data furnisher's reporting ceased. *See id. at 249*. In addition, when the mortgagee initially filed a credit dispute related to his loan origination date, the credit reporting agency erroneously created a **second** tradeline for the same account. *See id*. When the mortgagee alerted the loan servicer that there now existed two tradelines – one showing the loan was current, while the other showed the loan was closed and 120 days past due – both tradelines were repeatedly verified as accurate. *See id*. at 250. Under these circumstances the Court of Appeals for the Fourth Circuit upheld a jury's verdict in favor of the mortgagee. By contrast, the case *sub judice*, involves a student loan borrower who obtained a federal student loan, made absolutely no payments, resulting in her loan having to be transferred back to the lender without any payments ever having been made.

Finally, the Plaintiff directs the Court's attention to a very recent decision from this Court, *Barrow v. Trans Union, LLC*, Case No. 2:20-cv-3628 (E.D. Pa. April 9, 2021), in which Judge Joyner respectfully disagreed with Judge Kearney's decision in *Bibbs*, *supra*, and denied the Defendant's motion for

33

judgment on the pleadings. Central to Judge Joyner's decision, however, was that, unlike here, no discovery had been taken and a more complete record had not yet been developed.  In addition, the Plaintiff in *Barrow,* unlike the Plaintiff here*,* clearly alleged that she had fully satisfied her account.

While Plaintiff argues that questions about the inaccurate or misleading quality of information are for the jury, the material facts are not in dispute. After construing those facts in the light most favorable to Plaintiff and drawing all inferences in her favor, and construing the FCRA liberally in order to protect consumers such as Plaintiff, the Court concludes as a matter of law that FedLoan complied with its obligations under 15 U.S.C. § 1681s–2(b)(1) and that the reported information is neither inaccurate nor misleading. Accordingly, FedLoan's motion for summary judgment is granted.